**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

OCÉ NORTH AMERICA, INC.      *

                        *

       v.           *  Civil Action WMN-10-0984

                        *

MCS SERVICES, INC. <u>et al.</u>    *

   *     *     *     *     *     *     *     *     *     *     *     *

<u>**MEMORANDUM**</u>

Pending before the Court are several motions, one of which is potentially dispositive. At this time, the Court will only address Plaintiff Océ North America, Inc.'s motion to dismiss the first amended counterclaims of Defendant MCS Services, Inc., ECF No. 98.[1] The parties have fully briefed the motion and it is ripe for review. Upon a review of the pleadings and applicable case law, the Court determines that: (1) no hearing is necessary, Local Rule 105.7; and (2) Océ's motion to dismiss will be granted in part and denied in part as set forth below.

## I.   BACKGROUND

Among other products, Océ manufactures high-speed continuous form printers. Continuous form printers utilize large spools of paper, the pages of which are perforated and

---

[1] Also pending are several discovery-related motions. Given the number of disputes and the parties' ongoing inability to resolve them without seeking guidance from the Court, these motions will be referred to a magistrate judge for adjudication. A closely-related motion filed in a related case, ECF No. 61 in <u>MCS Services, Inc. v. Jones</u>, WMN-10-1042, will also be referred to a magistrate judge.

later separated only after they are fed through the printer.
These printers differ from cut-sheet printers, which utilize
individual pages.  Continuous form printers are used in
commercial applications and are capable of printing hundreds or
even thousands of pages per minute.  According to MCS, they
range in price from $100,000 to more than $1,000,000 and have a
life span of approximately twenty years.  MCS does not
manufacture any high speed printers.

Both Océ and MCS are engaged in the business of providing
maintenance services and selling replacement toner for high
speed printers.  Océ first filed this lawsuit alleging that MCS
misappropriated Océ trade secrets.  After a hearing in July
2010, the parties entered into a stipulated preliminary
injunction intended to constrain their behavior.  Later, MCS
filed counterclaims alleging antitrust and tort causes of
action, and Océ filed the instant motion to dismiss.

## II.  MOTION TO DISMISS

MCS' Counterclaims include the following: monopolization
and attempted monopolization of the Océ services aftermarket
(Counts I and II respectively); monopolization and attempted
monopolization of the Océ toner aftermarket (Counts III and IV
respectively); a request for injunctive relief premised upon
Counts III and IV (Count V); tortious interference with an
existing contract (Count VI); and intentional interference with

2

prospective advantage (Count VII). Océ argues all counts should be dismissed because MCS has failed to state a claim under the relevant pleading standards.

Under Federal Rule of Civil Procedure 8(a)(2), pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 does not require "detailed factual allegations," but "naked assertions, devoid of further factual enhancement" are insufficient. Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 St. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotations omitted). Likewise, unadorned accusations and rote recitation of a cause of action's elements fail to meet the requisite pleading standard. Id.

Instead, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Id. In this context, the plausibility standard demands more than the mere possibility of a defendant's liability. Id. To wit, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When evaluating the sufficiency of a pleading, courts are required to construe all facts in the light most favorable to

the plaintiff.  <u>Ibarra v. United States</u>, 120 F.3d 472, 474 (4th Cir. 1997).

## A.    The Antitrust Claims

MCS defines two relevant aftermarkets for its antitrust claims.  The first aftermarket, to which Counts I and II pertain, is the Service Aftermarket.  The second aftermarket is the Toner Aftermarket and it is the subject of Counts III through V.

### 1.   The Service Aftermarket

The Service Aftermarket, as defined by MCS, consists of the market within the United States for maintenance services and parts replacement for Océ high-speed continuous form printers. Océ currently markets such printers under the Variostream brand name but previously used the Pagestream brand name.  Both Pagestream and Variostream printers require maintenance services that are unique from services required by other high-speed continuous form printers offered by Océ's competitors.  Thus, the Service Aftermarket is limited exclusively to the servicing of Océ Pagestream and Variostream printers.  MCS alleges Océ has a market share in excess of 80% of the Service Aftermarket.

To aid the maintenance of its high-speed printers, Océ created a package of diagnostic tools (Service Tools).  The Service Tools include two types of diagnostic software relevant to this dispute: LPMW and CODI.  Both LPMW and CODI are used in

conjunction with software packages installed on each printer
called Bundles.  LPMW, which is presumably less sophisticated
than CODI, works with Bundles 5 and lower.  CODI works with
Bundle 6 and above.  Bundles 4 and below are installed on
Pagestream printers, while Variostream printers use either
Bundle 5 or Bundle 7.  As a result, Variostream printers can
leverage either LPMW, when Bundle 5 is installed on the printer,
or CODI, when Bundle 7 is installed.

MCS alleges that both LPMW and CODI decrease the cost of
servicing Océ printers thereby enabling enhanced competition.
CODI is especially important, so much so that MCS claims it is
"extremely difficult to provide maintenance services for
Variostream Printers with Bundle 7 without using CODI."
Counterclaim ¶ 18.  As such, MCS alleges it cannot effectively
compete for new customers or maintain current levels of service
to existing customers if it does not have access to CODI.
Counterclaim ¶ 18.  LPMW, in contrast, is less critical to MCS'
capacity to compete, but MCS is nevertheless handicapped without
access to it.  Counterclaim ¶ 19.  In short, MCS claims that
access to CODI and, to a lesser extent, LPMW, is critical to its
ability to provide competitive services in the Service
Aftermarket.

For several years, MCS utilized Océ's LPMW software to
service Océ printers.  MCS claims Océ was aware it was using

Océ's proprietary software, and MCS cites several examples of circumstantial evidence indicating Océ's alleged indifference to MCS' use of LPMW. <u>See</u> Counterclaim ¶ 20. Beginning in 2007, MCS and Océ began negotiating a "Value Added Reseller and Service Agreement" (VAR Agreement), which would have allegedly documented MCS' right to use Océ's Service Tools. According to MCS, Océ demanded in the negotiations that MCS limit its use of the Service Tools to existing MCS customers. MCS refused. Later, Océ filed this lawsuit alleging that MCS misappropriated Océ trade secrets by using Océ software without permission.

Over time, Océ has systematically updated the software on its Variostream printers from Bundle 5, which can be used with LPMW, to Bundle 7, which requires CODI. Because Bundle 7 printers are more expensive to service than Bundle 5 printers without the use of Océ Service Tools, MCS claims Océ has effectively prevented it from competing within the Service Aftermarket. MCS further alleges that Océ has attempted to prevent owners from downgrading their Variostream software from Bundle 7 to Bundle 5, even when MCS customers have requested permission to do so, thereby exacerbating the problem. Last, MCS claims that Océ's service prices for Bundle 7 printers are higher than those for Bundle 5 printers, and that the increased price is not commensurate with any difference in the cost of delivering the services.

In addition to MCS's allegations regarding Océ's Service Tools, MCS argues that purchasers of high speed printers lack access to information required to assess the long-term cost of maintenance services. This is problematic because high speed printers are exceedingly expensive, and purchasers must incur high switching costs if they wish to buy a new printer. MCS claims Océ's alleged exclusionary conduct will increase long-term maintenance costs in a manner unforeseeable to printer purchasers and such purchasers are therefore unable to make informed decisions regarding future costs when they choose to buy an Océ printer. Moreover, MCS submits that current printer owners will be unable to purchase a competing printer if they do not wish to incur the higher fees associated with Océ's services because the switching costs are so high. Such owners are thus locked into the Service Aftermarket and vulnerable to anticompetitive behavior.

MCS' final complaint regarding Océ's behavior in the Service Aftermarket pertains to Océ's conduct after Océ filed this lawsuit. In October 2010, MCS claims Océ made false and misleading statements to owners of Océ printers regarding the quality and legality of MCS's services. This allegation is also the foundation for MCS's tort claims, which are discussed below. In sum, MCS claims that Océ's behavior decreased consumer choice and excluded competition in the Service Aftermarket.

## 2.  The Toner Aftermarket

MCS's second aftermarket is delineated as the market in the United States for replacement toner for Océ high speed printers. Toner for Océ printers is not interchangeable with that of other printers. MCS alleges that Océ has a dominant market share in excess of 90% in the Toner Aftermarket.

Océ recently modified its printers such that when an Océ printer uses non-Océ-branded toner, the printer will initiate a "clean stop" by momentarily pausing every 3000 pages to clean itself. In contrast, Océ printers using Océ-branded toner stop less frequently. MCS claims this modification is not justified by performance or quality differences or other legitimate business purposes. Furthermore, MCS argues Océ made false and misleading statements to existing and prospective customers of MCS regarding the quality of MCS's toner. Those statements, coupled with Océ's modifications, allegedly constitute exclusionary behavior in the Toner Aftermarket.

## 3.  Analysis

An actionable claim for monopolization involves: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

Similarly, a claim for attempted monopolization involves: "(1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 166 (4th Cir. 1992). Both causes of action therefore require anticompetitive behavior or monopoly power in a relevant market.

Generally, a relevant market in a monopolization action cannot be limited to the products of a single manufacturer. See United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 393 (1956). An aftermarket, therefore, does not always constitute a separate market for antitrust purposes, but one may be defined as such if a primary market does not effectively prevent anticompetitive behavior in the primary market's derivative markets. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 464-73 (1992). As the Third Circuit recently explained:

> Many firms supply unique and/or proprietary aftermarket parts and services for their primary market products. As a result, they can be expected to have a very high percentage share of the relevant aftermarket. But high aftermarket share is not necessarily indicative of monopoly power . . . because aftermarket behavior generally is disciplined by competition in the primary product market. If the primary market is competitive, a firm exploiting its aftermarket customers ordinarily is engaged in a short-run game—for when buyers evaluate the "lifecycle" cost of the product, the cost of the

> product over its full service life, they will shop
> elsewhere.

Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381–82 (3d Cir. 2005) (internal quotations omitted). Nevertheless, when certain barriers prevent accurate lifecycle cost estimates, such as when access to information regarding maintenance and service costs is impossible to acquire, primary markets are rendered incapable of disciplining derivative markets, and such derivative markets may stand alone for antitrust analysis.[2] Eastman Kodak Co., 504 U.S. at 473.

In this case, MCS alleges Océ customers "lack reasonable access to information necessary to accurately assess the long-term cost of maintenance services and other after-market costs." Counterclaim ¶ 30. Furthermore, because Océ printers are exceedingly expensive and operate for many years, MCS claims that "[p]urchasers of Océ High-Speed Printers are locked in to their purchase and are inhibited from switching to competing brands of High-Speed Printers in response to Océ's exclusionary conduct." Counterclaim ¶ 32. And finally, MCS reiterates this position in its opposition to the motion to dismiss:

---

[2] In this way, the alleged exclusionary conduct within the relevant market bears directly on the existence of the relevant market because the exclusionary conduct may prevent customers from obtaining information required for an accurate lifecycle cost analysis. The analysis therefore requires an examination of the second element of a monopolization claim, exclusionary conduct, to establish the presence of the first element, monopoly power in a relevant market.

> MCS has alleged that consumers of High-Speed Printers
> are unable to effectively inform themselves of the
> lifecycle costs of High-Speed Printers and that they
> are effectively locked into the primary market because
> of high switching costs . . . . These allegations are
> sufficient to allege that competition in the High-
> Speed Printer market is insufficient to discipline the
> Service Aftermarket, which, in turn, satisfies MCS's
> pleading burden with regard to the separateness of the
> Service Aftermarket.

Opp'n to Mot. Dismiss at 10, ECF No. 109.

Despite MCS's repeated assertions regarding lifecycle cost information asymmetry, it fails to plausibly explain exactly why printer purchasers cannot obtain this information. MCS emphasizes the high purchase price of high speed printers and the attendant risk of customers being locked-in to their purchase. If anything, however, the high purchase price would indicate customers of high speed printers are likely to be sophisticated enterprises with experience working with these machines. Thus, MCS would need to allege a significant measure of conduct exacerbating any information asymmetry to make its claims plausible. To that end, MCS argues Océ's post-sale policy changes and misleading statements rendered lifecycle cost analyses impossible. But as described below, these allegations are insufficient to create an inference that the primary high speed printer market does not effectively discipline the Service Aftermarket.

Specifically, MCS submits that Océ's first policy change occurred when it denied MCS access to its Service Tools after previously "acquiesce[ing]" to MCS's use of LPMW software. Counterclaim ¶ 20. In turn, MCS's cost of servicing Océ machines increased. Thus, the argument proceeds that a customer could not have anticipated Océ's change of policy and MCS's attendant increase in costs when the customer initially chose to purchase an Océ printer based on a lifecycle cost assessment. The same argument applies to Océ's decision to upgrade its Variostream printer software from Bundle 5 to Bundle 7, which also increased the cost of MCS's services.

As an initial matter, MCS assumes its prior use of LPMW software should somehow estop Océ from asserting control over its intellectual property, yet it provides no support for this proposition. MCS also claims its use of the Service Tools was rightful, ECF No. 109 at 12, but MCS's Counterclaims include no allegations plausibly indicating a prior agreement under which Océ granted MCS permission to use its Service Tools. If anything, the Counterclaims evince a measure of impropriety in the means by which MCS obtained the Océ software. For example, MCS claims that "Océ makes no effort to ensure [its] employees return all confidential and/or copyrighted software" when the employees are terminated, and that Océ allows its employees to purchase older laptops without removing any confidential

information.  Counterclaim ¶ 20.  From there, it is reasonable
to infer that MCS secured confidential Océ software without
Océ's permission, yet MCS now complains that Océ has improperly
sought to restrict MCS's use of that software.  If MCS's
capacity to compete is built exclusively on its unlawful use of
Océ trade secrets, it would be unreasonable to hold that Océ's
efforts to protect its trade secrets are anticompetitive.  This
is one reason why MCS claims that its use of LPMW was rightful
and that access to LPMW is not a precondition to servicing Océ
printers.  At most, therefore, Océ's change of policy was to
enforce its intellectual property rights where it was earlier
less vigilant.

　　　The owner of intellectual property "has an exclusive right
to sell, rent, lease, lend, or otherwise distribute" the
property to whomever the owner chooses, provided the owner does
so independently.  Serv. & Training, Inc. v. Data Gen. Corp.,
963 F.2d 680, 686 (4th Cir. 1992).  Nevertheless, "[n]either the
aims of intellectual property law, nor the antitrust laws
justify allowing a monopolist to rely upon a pretextual business
justification to mask anticompetitive conduct."  Image Technical
Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1219 (9th Cir.
1997).  Even so, "while exclusionary conduct can include a
monopolist's unilateral refusal to license a copyright, an
author's desire to exclude others from use of its copyrighted

work is a presumptively valid business justification for any immediate harm to consumers." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1187 (1st Cir. 1994) (abrogated on other grounds).

In this case, MCS claims both that Océ's refusal to license its software was pretextual and that Océ cannot rely upon a copyright assertion alone to succeed on a motion to dismiss. As it does frequently throughout its opposition, MCS argues the presence or absence of a pretextual motive is a question of fact that must be developed through discovery, and therefore the Court cannot grant Océ's dismissal motion. MCS's argument fails for several reasons. First, MCS admits that Océ was willing to license the Service Tools as part of the VAR Agreement under certain conditions. This admission subverts MCS's claim that Océ has improperly refused to license its intellectual property. More importantly, however, the Counterclaims state baldly that Océ's decision to enforce its intellectual property rights was pretext for anticompetitive behavior, but MCS provides no additional support or further factual enhancement to this allegation. Even construing all inferences in favor of MCS, MCS has alleged nothing that would lead to the reasonable inference that Océ is liable for an antitrust violation. While MCS correctly notes that questions of fact must be developed through discovery, MCS bears the initial burden of pleading sufficient

allegations to warrant the lengthy discovery required of antitrust cases.  Here, MCS has not done so.

Moreover, MCS does not allege that Océ has refused to allow its customers to seek maintenance services from non-Océ providers.[3]  Independent maintenance providers remain free to compete for Océ printer service contracts, and Océ is free to compete with the independent companies by leveraging its own intellectual property.  Given the propriety of Océ's alleged change of policy with respect to its intellectual property, this allegation is insufficient to show either exclusionary conduct or conduct that may cause purchasers to inaccurately assess the lifecycle cost of Océ printers.

Finally, MCS's intellectual property change of policy argument fails for one additional reason.  Océ's alleged decision to protect its trade secrets impacts only potential independent providers of maintenance services; the policy does

---

[3] MCS does, however, allege that by denying independent service providers access to CODI, Océ has effectively made it impossible for independent providers to operate.  In response, Océ notes that MCS executives admitted during testimony provided in the preliminary injunction hearing that MCS does not require the Service Tools to perform maintenance services.  In light of this apparent contradiction, Océ argues that MCS should be judicially estopped from claiming that access to the Service Tools is required to provide competitive services.  This is a motion to dismiss, however, and the Court cannot entertain evidence outside the pleadings.  Consequently, the Court need not address this argument further.

not directly impact actual purchasers of Océ printers.  As one District Court opined:

> In accordance with the holdings of the First, Third, Sixth, and Seventh Circuits as well as numerous federal courts and commentators, . . . an antitrust plaintiff cannot succeed on a Kodak type theory where the defendant has not . . . exacted supracompetitive prices by implementing a restrictive anticompetitive change of policy that locked in customers, or used other coercive anticompetitive methods to deceive customers about the prices they would have to pay for parts and service.

Metzler v. Bear Auto. Serv. Equip. Co., 19 F. Supp. 2d 1345, 1353 (S.D. Fla. 1998).  Because Océ's policies have not changed vis-à-vis its customers, MCS cannot rely upon this theory to sustain its claim.

Similarly, Océ's alleged change of policy with respect to its upgrade of Variostream printers from Bundle 5 to Bundle 7 is also insufficient to cause concern regarding exclusionary conduct or lifecycle cost analyses.  MCS admits that it "does not allege that the introduction of Bundle 7 software was itself anticompetitive"; rather, MCS argues the upgrade effectively denied customers the opportunity to continue to use Bundle 5. ECF No. 109 at 14-15.  MCS does not, however, refute Océ's position that Bundle 7 is superior software implemented to confer additional benefits on Océ's customers.  On this point, too, MCS falls back on its rejoinder that any possible justification for upgrading Variostream printers to Bundle 7 is

a question of fact to be answered through discovery. In the absence of more sinister allegations, however, the Court will not ignore the Counterclaims' lack of "further factual enhancement," Iqbal, 129 St. Ct. at 1949, or the "obvious alternative explanation," Twombly, 550 U.S. at 567, that Bundle 7 is a superior product to Bundle 5. This alleged change of policy is insufficient to stand as either exclusionary conduct or as a barrier to obtaining accurate lifecycle cost information.

Next, MCS argues that Océ made false and misleading statements after this lawsuit was filed regarding the quality and legality of MCS's services. Such allegations typically do not give rise to antitrust claims. "[C]ourts should be circumspect in converting ordinary business torts into violations of antitrust laws." Military Servs. Realty, Inc. v. Realty Consultants of Virginia, Ltd., 823 F.2d 829, 832 n.4 (4th Cir. 1987); see also Sanderson v. Culligan Int'l Co., 415 F.3d 620, 623 (7th Cir. 2005) ("[A]ntitrust law condemns practices that drive up prices by curtailing output. False statements about a rival's goods do not curtail output in either the short or long run. They just set the stage for competition in a different venue: the advertising market." (internal citations omitted)). Thus, these allegations also fail to establish a claim for actual or attempted monopolization.

Finally, MCS argues that Océ's filing of this action is itself exclusionary conduct. Océ counters that it is insulated from antitrust liability by the Noerr-Pennington doctrine because this lawsuit is not baseless. In response, MCS argues that application of the Noerr-Pennington doctrine involves questions of fact to be developed in discovery, but MCS does not claim Océ's lawsuit is "objectively baseless." Even if the Court were to credit MCS's position, this claim alone is not sufficient to sustain a plausible action for actual or attempted monopolization.

In sum, MCS has failed to explain why customers are unable to obtain information necessary to complete accurate lifecycle cost analyses. As such, MCS has failed to establish the existence of a relevant market. Separately, but for the same reasons, MCS's allegations regarding exclusionary conduct are also insufficient and therefore MCS's claims fail for this second and independent reason. Counts I and II as they relate to the Services Aftermarket will therefore be dismissed.

MCS finds no greater success on Counts III through V, which relate to the Toner Aftermarket. While this may be a closer question, MCS has once again failed to allege facts upon which the Court may draw sufficient inferences to conclude that Océ's alleged antitrust violation is plausible. Especially where, as here, there is an obvious alternative to the theory advanced by

MCS, it is simply insufficient to sustain an antitrust claim on the basis of naked assertions that Océ lacks any business justification for instituting its new clean stop policy.  <u>See</u> <u>Twombly</u>, 550 U.S. at 567.  As Océ argues in its motion, printer toner generates dust.  Dust buildup inhibits performance.  Océ has an interest in ensuring its printers perform at optimal levels, and it can do so by ensuring that its printers remain clean even when using off-brand toner.  <u>See</u> <u>Berkey Photo, Inc.</u> <u>v. Eastman Kodak Co.</u>, 603 F.2d 263, 286 (2d Cir. 1979) (holding that introduction of superior products, even by monopolists, is "an essential element of lawful competition").  MCS correctly notes that toner performance and dust buildup is a question of fact, but in light of an obvious rationale for Océ's behavior, MCS has provided nothing to indicate a motivation more nefarious and exclusionary.  Absent more, <u>Twombly</u> teaches that such allegations are insufficient.  In addition, as MCS's claims based upon Océ's alleged false and misleading statements fail for the same reasons listed above, Counterclaim Counts III through V will also be dismissed.

### B.   The Tort Claims

Counterclaim Counts VI and VII are for Tortious Interference with Contracts and Intentional Interference with Prospective Advantage, respectively.  They derive from a letter dated October 20, 2010 (Letter), that Océ sent to various MCS

customers after the parties agreed to a stipulated preliminary injunction in this lawsuit.  See Counterclaim Ex. A, ECF No. 80-1.  The Letter includes at least six statements to which MCS objects as false and misleading and propounded with intent to injure MCS's business relationship.

### 1.  Tortious Interference with a Contract

To establish a claim for tortious interference with a contract in Maryland, MCS must sufficiently allege the following elements: (1) a contract between MCS and a third party; (2) Océ's knowledge of that contract; (3) Océ's intentional interference with that contract; (4) breach of that contract by the third party; and (5) damages caused by the breach.  See HavePower, LLC v. General Electric Co., 183 F. Supp. 2d 779, 784 (D. Md. 2002).  The third element requires a plaintiff to prove that "the interference was wrongful and without justification." Id. (quoting Sharrow v. State Farm Mutual Auto. Ins. Co., 511 A.2d 492, 498 (Md. 1986)).

The Restatement (Second) of Torts, which Maryland largely follows with respect to this cause of action, provides several factors to be balanced when determining whether the alleged interference was wrongful, including the nature of the actor's conduct, the actor's motive, and the interests sought to be advanced by the actor.  Restatement (Second) Torts § 767.  Thus, "if the [interference] be used for the indirect purpose of

injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff, . . . [the interference] is wrongful." Sharrow, 511 A.2d at 497 (quoting Knickerbocker Ice Co. v. Gardiner Dairy Co., 69 A. 405, 409 (Md. 1908)). Moreover, as interference often appears as inducement, it may include "any conduct conveying to the third person the actor's desire to influence him not to deal with the other." Restatement (Second) Torts § 766, Comment k. Such statements need not include any specific request, so long as the statements have the same effect as if a specific request were made. Id.

In this motion, Océ attacks MCS's efforts to establish the third, fourth and fifth elements of the tort. To simplify the analysis, the Court will address the fourth element, contract breach, first. Counterclaim ¶ 68 alleges that Océ had knowledge of "various maintenance/service contracts between MCS and Purchasers of Océ High-Speed Printers," including those between MCS and The Total Mailing System and the David J. Thompson Mailing Corp. Counterclaim ¶ 69 then alleges that Océ sent the Letter to "cause MCS customers to cease doing business with MCS," but it does not allege that any customers actually breached their contracts with MCS. Thus, Counterclaim ¶ 69 is insufficient to establish the fourth element of the tort. Instead, MCS must rely upon Counterclaim ¶ 71, which identifies third party Direct Mail Solutions (DMS) as an MCS customer

allegedly induced by Océ to breach its contract with MCS.

Specifically, Counterclaim ¶ 71 claims in relevant part:

> Oce also sent the October 20, 2010 letter to Direct
> Mail Solutions, a customer of MCS under an MCS
> maintenance contract. After receiving the letter,
> Direct Mail Solutions reduced the number of printers
> it allows MCS to service. This is despite Direct Mail
> Solutions' obligations under its contract with MCS.

Océ argues that MCS never explicitly alleges in Counterclaim ¶

71 or anywhere else that DMS breached its contract (DMS

Contract), and Océ relies upon the language of the DMS Contract,

which it attached to its motion to dismiss, as support for its

position.[4] See Cooperman Decl. Ex. at ¶ 6, ECF No. 98-14.

The DMS Contract paragraph in question provides: "Customer

shall provide written notice to MCS Services . . . prior to

permitting any persons except representatives of MCS Services to

adjust or repair the equipment." DMS Contract ¶ 6. Océ argues

this language gives DMS, the "Customer" identified in the above

language, authority to reduce the number of printers serviced by

MCS, thereby unilaterally altering the terms of the contract.

Neither the contract nor any other evidence supports Océ's

position. The plain language of the contract indicates DMS

secured the services of MCS to maintain six printers, all of

which are identified elsewhere in the contract. See DMS

---

[4] As MCS relies upon this document in its Counterclaims, the
Court may properly consider it on a motion to dismiss.

Contract Attachment 1. At most, DMS Contract ¶ 6 merely requires that DMS notify MCS if anyone else attempts to repair the printers; it does not give DMS authority to change the contract terms. Of course, if DMS continued to pay MCS the originally agreed-upon amount of money, merely reducing the number of printers that MCS maintains would not necessarily constitute actionable breach of the contract as there would be no damages. And the Counterclaims do not allege that DMS has not paid MCS consistent with the terms of the DMS Contract; rather, they state only that DMS reduced the number of printers MCS maintains. Nevertheless, the Court must construe all inferences in favor of MCS, and despite the awkward wording of the allegation, Counterclaim ¶ 71 is sufficient to allege a breach of the DMS Contract.[5]

With respect to the third element, intentional interference, Océ argues that nothing in its Letter is untruthful or inaccurate, and therefore the interference was not wrongful because the Letter is protected as mere competition among two firms competing for services. Océ relies upon Restatement (Second) of Torts § 768, which delineates conditions under which competitive statements are not improper. That

---

[5] To the extent MCS also claims Océ's alleged interference caused other, unspecified companies to breach their contracts with MCS, those claims must fail for lack of specificity. MCS's claim will only survive as it relates to the DMS Contract.

section, however, does not apply when the actor interferes with an existing contract that is not terminable at will. Restatement (Second) of Torts § 768(2). Here, MCS alleges that Océ's interference caused DMS to breach its contract with MCS. See Counterclaim ¶ 71. The DMS Contract, however, was not terminable at will; rather, it was a one-year term contract. DMS Contract ¶ 1. As such, Restatement § 768 does not apply, and Océ's interference cannot qualify as proper competition under the Restatement.

Because Océ's conduct falls outside § 768, it must be judged by the more restrictive standard summarized above. Drawing all inferences in favor of MCS, the plain language of the Letter can be read as an effort by Océ to promote its services at the expense of MCS's services. For example, the letter states that "Océ believes that there are certain types of maintenance that cannot be properly performed without diagnostic software. . . . However, we do not believe that MCS has developed any of its own diagnostic tools. You should verify that with MCS." Letter at 1-2. The Letter also indicates that "MCS is not an authorized Océ service provider," even though MCS alleges that there is no such thing as an authorized Océ service provider, and that "MCS is not licensed to use any of the proprietary tools used by Océ field engineers to quickly and accurately maintain and repair Océ printers." Letter at 1.

Finally, the Letter concludes that "[f]or these reasons we believe that Océ is in the best position to provide you with the service and maintenance that you need."  Letter at 2. Regardless of the veracity of the statements contained within the Letter, it is plausible to infer that Océ sent the Letter with the "indirect purpose . . . of benefitting [Océ] at the expense of [MCS]."  See Sharrow, 511 A.2d at 497.  And in fact, MCS includes just such an allegation in Counterclaim ¶¶ 69-72. Consequently, MCS has alleged facts sufficient to establish the third element of tortious interference with a contract.

Finally, Océ claims MCS has not properly alleged damages resulting from Océ's interference.  Counterclaim ¶ 73 claims that Océ's actions caused MCS to suffer a "loss of customers, loss of revenue, loss of profits and/or loss of current and future business."  MCS does not explicitly allege that DMS's breach caused MCS financial harm but, again, construing all inferences in favor of MCS, Counterclaim ¶ 73 is sufficient to survive a motion to dismiss.  As such, Océ's motion with respect to Count VI will be denied.

### 1.   Intentional Interference with a Prospective Advantage

A claim for intentional interference with a prospective advantage must allege: (1) an intentional and willful act; (2) calculated to cause damage to the plaintiffs in their lawful

25

business; (3) done with the unlawful purposes to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) that caused actual damage or loss. HavePower, 183 F. Supp. 2d at 784. Because this tort applies only to prospective advantages, "[a] broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." Natural Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (Md. 1984).

Moreover, as no existing contract is at issue here, the safe harbor for competitive interference found in Restatement (Second) of Torts § 768 is available to Océ. The Restatement provides:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor . . . does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768(1).

As discussed within the context of Counterclaim Counts I-V, the Letter is insufficient to create or continue an unlawful restraint of trade. Nevertheless, MCS argues the Océ employed

"wrongful means" because the Letter included false and misleading statements.  The Court disagrees.  To the extent the Letter reiterates Océ's unproven allegations, the allegations therein are described as such; Océ does not claim them as facts. Many other statements relating to the instant litigation are all in the public record, including the presence of the stipulated preliminary injunction, and Océ does not improperly divulge the details of that injunction.  Furthermore, it is also objectively true that Océ has not authorized MCS to use its intellectual property, regardless of whether Océ has authorized any others to use its software.  And insofar as Océ makes statements regarding what it believes to be its comparative advantages, those statements are qualified to indicate they are Océ opinions and not facts.  Finally, the Letter explicitly acknowledges that "MCS is free to sell and service Océ printing systems so long as it does not use [Océ] intellectual property," Letter at 2, thereby alleviating any potential confusion.  Thus, the Letter does not contain false statements.

MCS further argues that Océ employed "wrongful means" in sending the Letter to existing MCS customers because Océ allegedly obtained MCS's customer lists via improper means.  See Counterclaim ¶ 68.  Indeed, the allegation that Océ misappropriated MCS trade secrets is the basis of a related case before this Court among these parties.  Océ counters that such

conduct cannot support a claim for interference with prospective contracts because the customer list at issue allegedly included only existing customers of MCS.  But MCS's existing customers are also its prospective customers because their existing contracts will eventually expire.  Hence, the misappropriation of MCS's customer lists would constitute "wrongful means," thereby removing Océ's alleged conduct from the realm of permissible competitive statements.  As such, MCS has sufficiently pled allegations to support all four elements of a claim for intentional interference with a prospective advantage. See Counterclaim ¶ 75 (willful act calculated to cause damage); Counterclaim ¶ 68 (unlawful purpose); Counterclaim ¶¶ 75, 77 (resulting damages).  Océ's motion on this count will therefore be denied.

## III. CONCLUSION

For the foregoing reasons, Océ's motion to dismiss the counterclaims will be granted with respect to Counts I-V and denied with respect to Counts VI and VII.  The Court will issue a separate order.

_____ /s/

William M. Nickerson
Senior United States District Judge

June 14, 2011.